

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

ALK/SMS/SMS                                *271 Cadman Plaza East*
F. #2018R00369                             *Brooklyn, New York 11201*

January 24, 2025

By E-Mail and ECF

The Honorable Eric N. Vitaliano
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

>           Re:    United States v. Hector Rosario
>                  Criminal Docket No. 22-355 (ENV)

Dear Judge Vitaliano:

The government submits this letter in opposition to the defendant Hector Rosario's motions in limine to preclude evidence at trial. See ECF No. 138 ("Def's Mot."). As detailed in the government's motions in limine, see ECF No. 139 ("Gov't Mot."), the defendant, a former Nassau County Police Department ("NCPD") detective, is charged as an associate of the Bonanno crime family with obstruction of justice, in violation of 18 U.S.C. § 1512(c)(2), and making false statements to Special Agents of the Federal Bureau of Investigation ("FBI"), in violation of 18 U.S.C. § 1001(a)(2). See Indictment ¶¶ 16, 28-29, ECF No. 1. These charges stem from lies the defendant told FBI Special Agents during a January 2020 interview in an effort to obstruct a federal grand jury investigation into racketeering activity committed by members and associates of the Bonanno and Genovese crime families of La Cosa Nostra. See Gov't Mot. 2-6.

The defendant moves to preclude the following at trial: (1) any evidence related to the Blue Tequila (a bar previously owned by the individual referred to as "CW #2" in the government's motions in limine and "CW-3" in the defendant's motions, hereinafter "CW #2"); (2) "evidence related to or referencing prostitution;" (3) evidence that "suggests [the defendant] has engaged in or plans to engage in acts of violence;" (4) evidence that "suggests [the defendant] provided advice on how to obtain a false police report for a car accident;" (5) any reference to organized crime; (6) evidence relating to the defendant's NCPD employment and disciplinary records; (7) "evidence referencing [his] unrelated attorneys or legal matters;" (8) evidence "related to [his] girlfriend and newborn child;" and (9) evidence that he met CW #2 through an individual named Chandler. The defendant also moves to "strike the introduction section of the Indictment as well as counts one through six," in which he is not charged.

As an initial matter, the government does not intend to introduce evidence relating to prostitution, the defendant's girlfriend and/or child, or the defendant's personal legal matters. The government also does not object to the use of a trial indictment containing only the charges

against the defendant.[1]  Accordingly, the defendant's motions to preclude such evidence and to strike portions of the indictment should be denied as moot.  For the reasons explained below, the Court should deny the defendant's remaining motions on the merits.[2]

I.    The Court Should Deny the Defendant's Motion To Preclude Any Reference to Organized Crime

The Court should deny the defendant's motion to preclude any reference to organized crime at trial.  See Def's Mot. 10-11.  As explained in the government's motions in limine and below, evidence relating to the Bonanno, Genovese and Gambino crime families of La Cosa Nostra is inextricably intertwined with evidence regarding the charged offenses and is necessary to complete the story of the crime on trial.  Such evidence is also admissible under Federal Rule of Evidence 404(b) to establish the defendant's motive to lie to FBI Special Agents in an effort to obstruct the federal grand jury investigation into members and associates of the Bonanno and Genovese crime families.

A.    Relevant Background

By way of brief background, and as explained more fully in the government's motions, over the course of several years, the defendant used his position as an NCPD detective to help members and associates of the Bonanno crime family attempt to shut down competing gambling parlors run by the Genovese and Gambino crime families.  Members of the Bonanno crime family used proceeds from their own illegal gambling operations to pay the defendant for his efforts.  In January 2020, during a federal grand jury investigation into the racketeering activities of the Bonanno and Genovese crime families, including their operation of illegal gambling parlors, the defendant lied to FBI Special Agents in an effort to obstruct their investigation.  Among other lies, the defendant (1) denied knowing the identity of an inducted member of the Bonanno crime family who was involved in tasking and paying the defendant (referred to as "CW #1" in the government's motions and herein) and (2) denied being familiar with Sal's Shoe Repair, a Genovese-affiliated illegal gambling parlor that the defendant "raided" at the request of the Bonanno crime family, via CW #2.

At trial, the government intends to introduce evidence relating to the Bonanno, Genovese and Gambino crime families.  Specifically, the government intends to elicit testimony

---

[1]    The government will provide the proposed trial indictment for the Court's consideration under separate cover.  While the indictment returned by the grand jury in this case includes an allegation that the defendant is an associate of the Bonanno crime family, the government does not intend to include that allegation in the trial indictment.  However, for the reasons set forth in the government's motions in limine and herein, the government intends to offer evidence that the defendant was a Bonanno associate as direct evidence of the obstruction charge.

[2]    As stated herein, the government does not intend at this time to introduce in its case-in-chief certain evidence relating to "other acts" committed by the defendant, including, for example, NCPD disciplinary findings against the defendant.  The government reserves the right to seek to introduce such evidence if the defendant opens the door by, for example, arguing in opening statements that he was a model police officer.

from cooperating witnesses, including CW #1, an inducted member of the Bonanno crime family who has pleaded guilty to racketeering, and CW #2, an associate of the Bonanno crime family who was also involved in tasking and paying the defendant, about their associations with the Bonanno crime family and its illegal gambling operations as well as their recruitment of the defendant to attempt to shut down competing gambling parlors operated by the Genovese and Gambino crime families, including Sal's Shoe Repair.[3] The government also intends to elicit testimony from law enforcement witnesses that will involve the Bonanno, Genovese and Gambino crime families. For instance, federal law enforcement witnesses who investigate organized crime will testify about the existence of the federal grand jury investigation into the racketeering activities of the Bonanno and Genovese crime families, including the families' operation of illegal gambling parlors, which investigation the defendant intended to obstruct.

B.   <u>Evidence Relating to Organized Crime Is Admissible at Trial</u>

It is well-established that evidence that is "inextricably intertwined with the evidence regarding the charged offense," or "is necessary to complete the story of the crime on trial" is admissible as direct evidence. <u>See, e.g.</u>, <u>United States v. Robinson</u>, 702 F.3d 22, 37 (2d Cir. 2012); <u>United States v. Carboni</u>, 204 F.3d 39, 44 (2d Cir. 2000). Accordingly, a "trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment." <u>United States v. Gonzalez</u>, 110 F.3d 936, 941-42 (2d Cir. 1997) (quoting <u>United States v. Coonan</u>, 938 F.2d 1553, 1561 (2d Cir. 1991)). Background evidence may be admitted in order to show, for example, the "circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." <u>Gonzalez</u>, 110 F.3d at 941 (quoting <u>Coonan</u>, 938 F.2d at 1561); <u>accord</u> <u>United States v. Inniss</u>, No. 18-CR-134 (KAM), 2019 WL 6999912, at *4 (E.D.N.Y. Dec. 20, 2019). In addition, direct evidence may include that which shows "the development of a relationship of trust between the participants" in a crime. <u>United States v. Pascarella</u>, 84 F.3d 61, 73 (2d Cir. 1996). Indeed, as the Supreme Court has recognized, in analyzing the admissibility of evidence, the trial court should make its determinations "with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case." <u>Old Chief v. United States</u>, 519 U.S. 172, 183 (1997).

Additionally, the Second Circuit has made clear that, "when a defendant has been charged with attempted or actual obstruction of justice with respect to a given crime, evidence of the underlying crime and the defendant's part in it is admissible to show the motive for his efforts to interfere with the judicial process." <u>United States v. Willoughby</u>, 860 F.2d 15, 24 (2d Cir. 1988) (affirming admission of evidence about underlying robbery at trial of defendants charged only with

---

[3]     For this reason, evidence relating to organized crime is also admissible because cooperating witnesses must be permitted to testify openly about their own actions including their involvement with organized crime, so that the jury can make a well-informed evaluation of their credibility. <u>See</u> <u>United States v. Coonan</u>, 938 F.2d 1553, 1561 (2d Cir. 1991) ("[S]ince the witnesses were participants in the events about which they testified, it was appropriate for the prosecution to elicit testimony during direct examination that exposed details damaging to their credibility . . . to avoid the appearance that it was concealing impeachment evidence from the jury."); <u>United States v. Guerrero</u>, 882 F. Supp. 2d 463, 493 (S.D.N.Y. 2011), <u>aff'd</u>, 560 F. App'x 110 (2d Cir. 2014) (same).

3

conspiring to obstruct justice); accord United States v. Fakih, 264 Fed. App'x 78, 79-80 (2d Cir. Feb. 13, 2008) ("[G]iven the government's theory that Fakih's participation in the credit card fraud scheme motivated him to tamper with a witness and interfere with a grand jury's investigation of that same credit card fraud, as well as the district court's appropriate limiting instruction, the evidence is admissible under Rule 404(b) as proof of motive."); United States v. Sampson, No. 13-CR-269 (S-5) (DLI), 2015 WL 2066073, at *3 (E.D.N.Y. May 4, 2015) (admitting evidence of defendant's participation in underlying embezzlement scheme in obstruction of justice trial because, inter alia, the "evidence show[ed] a motive for committing the obstruction of justice, witness tampering, and false statement offenses").

Under these standards, in United States v. Russo, the Second Circuit affirmed the admission of evidence related to the defendants' associations with the Colombo crime family in an obstruction of justice trial. In that case, Andrew Russo and Dennis Hickey were charged with obstruction of justice offenses for concealing a witness from the FBI who had information about their jury tampering efforts in connection with the racketeering trial of Colombo crime family member Joseph Russo. 302 F.3d 37, 40-42 (2d Cir. 2002). Hickey hid the witness from the FBI on his farm on Long Island for over a year. Id. at 41. The Second Circuit found that evidence relating to the defendants' association with the Colombo crime family was "relevant in several ways," including (1) that the evidence "explained Hickey's motivation to conceal [the witness];" (2) that the evidence "explained Andrew and Joseph Russo's readiness to trust Hickey to conceal [the witness] from the F.B.I.," and (3) that without the evidence "[t]he jury would not have understood that Hickey had a stake in ensuring that the FBI did not find [the witness]." Id. at 43. In other words, Hickey's association with the Colombo crime family was appropriately admitted to establish his motive for the charged obstruction of justice, to explain the relationship between co-conspirators and to provide the jury with the full context of the crime on trial.

So too here. Evidence relating to the Bonanno, Genovese and Gambino crime families is inextricably intertwined with the evidence regarding the charged offenses and is necessary to complete the story of the crimes on trial. The defendant is charged with obstructing a federal grand jury investigation into the racketeering activities of the Bonanno and Genovese crime families—racketeering activities that the defendant participated in by assisting the Bonanno crime family's illegal gambling operation. It would be impossible to complete the story of the crimes on trial without explaining to the jury that these crime families exist and were operating illegal gambling parlors; that the Bonanno crime family enlisted and paid the defendant to shut down competing parlors; that the FBI was investigating the crime families and their illegal gambling operations; and that, when asked about individuals and places involved in those illegal gambling operations, including individuals with whom he had conspired, the defendant lied.

Accordingly, the Court should deny the defendant's motion to preclude evidence relating to organized crime.

II.    The Defendant's Motion To Preclude All Evidence Relating to the "Blue Tequila" Should Be Denied

The defendant moves to preclude "evidence related to the Blue Tequila" as irrelevant under Federal Rule of Evidence 401 and unduly prejudicial under Federal Rule of Evidence 403. See Def's Mot. 2-3. The Court should deny this motion as well.

4

As noted above, the Blue Tequila was a bar that CW #2 owned and operated. At times, the Blue Tequila contained illegal gambling machines. Additionally, women were regularly brought to the Blue Tequila and paid to entertain male customers and encourage customers to purchase drinks. The defendant introduced CW #2 to an individual who had connections for bringing such women to the Blue Tequila. The defendant also asked CW #2 to hire the defendant's friend as security at the Blue Tequila, which CW #2 did. That friend of the defendant was also involved in narcotics activity.

At present, the government does not intend to introduce evidence relating to potential prostitution, gambling or other illicit activities at the Blue Tequila.[4] The government does, however, expect to elicit other limited testimony about the Blue Tequila. Specifically, the government anticipates that CW #2 will testify that he owned the Blue Tequila and that he sometimes met with the defendant at the Blue Tequila. The government also anticipates testimony from CW #1 and another witness that each of them observed the defendant at the Blue Tequila, including associating with CW #2. Finally, the government anticipates that an FBI Special Agent will testify that, during the January 27, 2020, interview of the defendant, FBI Special Agents asked the defendant whether the defendant was aware of businesses CW #2 was involved in other than CW #2's auto repair shop, and that the defendant claimed he was unaware of any other businesses with which CW #2 was affiliated. After the FBI Special Agents specifically asked about the Blue Tequila, the defendant acknowledged CW #2 may have had dealings with the Blue Tequila.

This limited testimony is admissible to complete the story of, and provide necessary background for, the charged crimes. Specifically, the anticipated testimony from CW #1, CW #2 and the witness who observed the defendant at the Blue Tequila is relevant to establishing the relationship between CW #2 and the defendant. Such evidence also is admissible under Rule 404(b) as evidence of the defendant's consciousness of guilt with regarding to the charged obstruction because it tends to show that the defendant took "effort[s] to distance himself" from CW #2 (and the Bonanno crime family) by means of a false exculpatory statement during the January 2020 interview with FBI Special Agents. See United States v Mahaffy, 477 F. Supp. 2d 560, 564 (E.D.N.Y. 2007), vacated and remanded on other grounds, 285 Fed Appx 797 (2d Cir. 2008) (admitting under Rule 404(b) evidence of uncharged false statements made during the same law enforcement interview as charged false statements).[5]

Finally, the anticipated testimony is not unduly prejudicial in that it does "not involve conduct any more sensational or disturbing than the crimes with which [the defendant is] charged." United States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir. 1990).

---

[4]     As noted above, the government may seek to admit such evidence if the defendant opens the door by, for example, arguing that he was an exemplary police officer.

[5]     The same can be said for other false statements made by the defendant to FBI Special Agents concerning topics such as CW #2's grow house and using law enforcement databases to search for a potential cooperating witness at CW #2's behest, which are detailed in the government's motions. Those statements—and evidence showing that they were in fact false statements—also tend to show the defendant's consciousness of guilt with respect to his obstructive conduct.

Accordingly, the Court should deny the defendant's motion to preclude any mention of the Blue Tequila.

III.   <u>If the Defendant Elects To Testify, the Government Should Be Permitted To Cross-Examine the Defendant about Specific Instances of Past Untruthful Misconduct</u>

The defendant moves to preclude his NCPD "employment and disciplinary records" as irrelevant under Rule 401 and unduly prejudicial under Rule 403. <u>See</u> ECF No. 138 at 13-15. At the outset, the government does not understand the defendant to be seeking to preclude all references to the defendant's employment as a detective with the NCPD. Nor could he. As explained above and in the government's motions <u>in limine</u>, the defendant's position as a detective with the NCPD is critical background to the jury's understanding both of his involvement in the underlying schemes and thereafter to his efforts (and motivations) to obstruct justice. Indeed, the defendant's position as a detective is what made his assistance valuable to the Bonanno crime family and he used that position in attempting to shut down competing gambling parlors.

As to the defendant's disciplinary records, the government does not intend to introduce evidence from the defendant's disciplinary records in its case-in-chief. However, if the defendant elects to testify, the government should be permitted to cross-examine the defendant with respect to specific instances of his past misconduct that bear on his credibility.

A.   <u>Relevant Law</u>

"A district court is afforded broad discretion in controlling the extent and scope of cross-examination." <u>United States v. Wilkerson</u>, 361 F.3d 717, 745 (2d Cir. 2004) (citations and quotations omitted). Cross-examination in general "should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness." Fed. R. Evid. 611(b). Where evidence of specific acts is offered to attack the witness's character for truthfulness, its admission is governed by Rule 608(b), which provides in relevant part, that the court may allow inquiry into "specific instances of the conduct" of a witness on cross-examination if those acts are "probative of truthfulness or untruthfulness." Fed. R. Evid. 608(b). "In addition to determining whether, on cross-examination, a particular prior act is probative of truthfulness and therefore permissible under Rule 608(b), the court still must be guided by Rules 611 and 403 in deciding whether to exercise its discretion to allow cross-examination pursuant to Rule 608(b)." <u>United States v. Brown</u>, No. 07-cr-874 (KAM), 2009 WL 497606, at *4 (E.D.N.Y. Feb. 26, 2009).

As a general matter, "[c]omplaints against officers are not probative of a law enforcement witness's truthfulness or untruthfulness unless the underlying conduct involves dishonesty." <u>United States v. Daniels</u>, 566 F. Supp. 3d 191, 193–94 (E.D.N.Y. 2021) (quoting <u>Bryant v. Serebrenik</u>, No. 15-cv-3762 (ARR)(CLP), 2017 WL 713897, at *2 (E.D.N.Y. Feb. 23, 2017)). However, when the underlying conduct does involve dishonesty, it may be admissible. <u>See, e.g.</u>, <u>United States v. Romanello</u>, No. 22-CR-194 (EK), 2023 WL 8283435, at *5 (E.D.N.Y. Nov. 27, 2023) (authorizing cross-examination into Internal Affairs Bureau allegation that officer had made computer inquiries unrelated to official NYPD business on an NYPD computer because "the system would likely have required him to falsely represent, when logging in, that he was accessing it for official business purposes" which would be "probative of his credibility, honesty, or integrity").

The cases that the defendant cites are not to the contrary. See Def.'s Mem. at 14. For example, in United States v. Dekattu, 18 Cr. 474 (ARR), 2019 WL 885620, at *1 (E.D.N.Y. Feb 22, 2019), the court prohibited cross-examination of a law enforcement witness for substantiated instances of past misconduct because they did not involve dishonesty. Similarly, in United States v. Ahmed, 14 Cr. 277 (DLI), 2016 WL 3647686, at *3 (E.D.N.Y. July 1, 2016), the court precluded cross-examination of physicians for prior allegations of malpractice because those allegations were not probative of their truthfulness.[6]

### B. Discussion

Here, if the defendant elects to testify, the government will seek to cross-examine the defendant on the following specific instances of misconduct that bear directly on his truthfulness.

### 1. The Defendant's Forgery of Doctor's Letters

In 2022, the NCPD Internal Affairs Unit ("IAU") determined after an internal investigation that the defendant had violated NCPD rules by presenting NCPD with a series of doctor's letters that he knew contained fraudulent and misleading information. Specifically, the IAU found that in 2021 and 2022, in order to circumvent NCPD policy prohibiting facial hair, the defendant submitted eight doctor's notes purportedly from a physician (the "Physician") indicating that they were from a specific medical practice on specific dates in 2021 and 2022. Each of the notes stated that the defendant had a medical condition which required an exemption from NCPD's shaving policy. However, the IAU found that the Physician had not worked at the practice since 2019, and that the defendant had not visited with the Physician since 2018. The IAU concluded that the defendant had altered a previously legitimate letter by changing the dates to make it appear that he had recently visited with the Physician at the practice. In addition, the IAU also concluded that the defendant drafted and signed a letter to the commanding officer of the NCPD Medical Administration Office in which he represented that he was "currently being treated" by the Physician and "last saw my doctor in May 2022." However, as noted above, the Physician had not worked at the practice since 2019 and the defendant had not visited with him since 2018.

As a result of the investigation, the IAU recommended that the defendant be charged with one violation of NCPD rules for engaging in conduct unbecoming of an officer or member of the NCPD, or in any conduct unbecoming an officer or member of the NCPD, or in any action which may be prejudicial to the good order and efficiency of the NCPD, and eight violations of NCPD rules for making false official communications, records, or statements. Ultimately, because the defendant was terminated from the NCPD based on the founded

---

[6]      The defendant also cites Phillips v. City of New York, 871 F. Supp. 2d 200, 203 n.2 (E.D.N.Y. 2012), a civil § 1983 case against New York City and several NYPD officers. There, in the context of deciding to sever the trial against the City from the case against the officers, the court explained that evidence of lawsuits, complaints and investigations would not be admissible against the defendant officers in the plaintiff's case-in-chief under Rule 404(b) because, among other reasons, they were not substantiated. Phillips did not confront the question of introducing evidence probative of truthfulness on cross-examination under Rule 608(b).

allegations described below that he facilitated the provision of confidential law enforcement information to a civilian, no charges were levied and no penalty was imposed.

"[A]cts such as forgery, perjury, and fraud are probative of untruthfulness, and are presumed admissible under Fed. R. Evid. 608(b)." United States v. Brown, No. 07-CR-874 (KAM), 2009 WL 497606, at *3 (E.D.N.Y. Feb. 26, 2009) (internal quotation marks and citation omitted); see United States v. Walia, No. 14-CR-213 (MKB), 2014 WL 3734522, at *15 (E.D.N.Y. July 25, 2014) (permitting cross-examination into prior arrest for forgery under Rule 608(b)). Here, after an IAU investigation, the defendant was found to have forged eight doctor's notes. Accordingly, if the defendant chooses to testify, the government should be permitted to cross-examine him about these prior specific instances of forgery, which are probative of his credibility, honesty and integrity.

> 2.   The Defendant's Concealment of his Involvement in the Subject Matter of an IAU Investigation

In 2019, the IAU determined after an internal investigation that the defendant had impaired an investigation into numerous restricted parking placards that had been found in civilian custody. Specifically, in the course of that investigation, one subject indicated that he had received a parking placard from an individual who was later identified as the defendant's fiancé. Over three interviews with the NCPD, the defendant's fiancé refused to identify the name of the NCPD detective to whom she was engaged—i.e., the defendant. Although the officers provided her with a phone number to give to her fiancé so that he could identify himself, the defendant did not do so. Thus, NCPD spent approximately three weeks working to identify her fiancé, who, as stated, they ultimately determined was the defendant.

As a result of the investigation, the IAU recommended that the defendant be charged with one violation of NCPD rules for engaging in actions that may interfere with or impair the efficiency or operation of the NCPD. The defendant was docked 16 hours of leave for the violation.

Where law enforcement witnesses are found to have concealed information, such concealment is probative of untruthfulness. See Hetherington v. Meador, No. 89-CV-7809, 1992 WL 398365, at *7 (E.D. Pa. Dec. 30, 1992), aff'd, 6 F.3d 779 (3d Cir. 1993) (concluding officer could be cross-examined about suspension for concealing information under Rule 608(b)). The defendant's concealment of his identity from the IAU investigation is similarly probative of his truthfulness and the government should be permitted to cross-examine the defendant about this conduct if the defendant testifies.

> 3.   The Defendant's Surreptitious Introduction of an Interested Civilian into a Law Enforcement Sensitive Discussion

In 2020, the IAU determined after an internal investigation that the defendant had enabled the provision of confidential law enforcement information to a civilian with an interest in the at-issue investigation. Specifically, on November 17, 2019, NCPD officers from the Seventh Precinct conducted a license premises check at a restaurant located in Massapequa, New York (the "Restaurant"). During the license premises check, several patrons and employees of the Restaurant surrounded the NCPD officers in an intimidating manner. In addition, when NCPD officers opened the door to a bathroom in the rear of the establishment that had the lights off, the officers

turned on the lights and found multiple patrons as well as drug paraphernalia. One of the patrons had a large quantity of United States currency. The Restaurant ultimately received four violations for disorderly premises (excessive noise), lewd behavior, failing to conspicuously display a pregnancy warning sign, and failing to comply with local fire, health and safety regulations. In addition, due to concerns with both narcotics and gang activity at the Restaurant, the Deputy Commanding Officer of the Seventh Precinct notified NCPD officers in the Gang Squad and the Narcotics/Vice Squad of the events at the Restaurant to enable them to investigate.

On November 21, 2019, the defendant and another individual ("the Civilian") went unannounced to the Seventh Precinct—where the defendant did not work—and spoke with the Deputy Commanding Officer about the Restaurant. The investigation revealed that the defendant and the Civilian both appeared to be detectives, and the defendant did not clarify that the Civilian was in fact the "head of security" for the Restaurant. Because he was given the impression that the Civilian was a member of law enforcement, the Deputy Commanding Officer provided the defendant and the Civilian with law enforcement sensitive information about the follow-up investigations into the Restaurant by the Gang Squad and the Narcotics/Vice Squad. It was not until after the Deputy Commanding Officer had disclosed that sensitive information that the defendant told the Deputy Commanding Officer that the Civilian was not a law enforcement officer, but was head of security at the Restaurant. After the disclosure, the Deputy Commanding Officer—who was "blindsided"—removed the Civilian from his office, told the defendant that the information they had discussed could potentially put NCPD officers in danger, and admonished the defendant that it was improper for the defendant to knowingly have a civilian present during that conversation.

As a result of the investigation, the defendant was charged and pleaded guilty to one count of engaging in actions that may interfere with or impair the efficiency or operation of the NCPD; one count of engaging in conduct unbecoming of an officer or member of the NCPD, or in any conduct unbecoming an officer or member of the NCPD, or in any action which may be prejudicial to the good order and efficiency of the NCPD; one count of engaging in other business, calling, or conduct which is unlawful or may create a conflict of interest or an appearance of impropriety in connection with employment with the NCPD; one count of not keeping his supervisor informed of all important matters and actions taken pertaining to those matters; one count of engaging in off-duty employment without notifying his commanding officer; and one count of failing to treat as confidential the official business of the NCPD and information obtained by him by virtue of his official capacity. As a result of these charges, the defendant was terminated from employment with the NCPD on August 25, 2022.

"A number of courts in this Circuit have held that a witness' use of false names or identities is the proper subject of cross-examination under Rule 608." Marshall v. Port Auth. of New York & New Jersey, No. 19-CV-2168 (LJL), 2022 WL 17491006, at *4 (S.D.N.Y. Dec. 5, 2022) (collecting cases); see also Fishon v. Peloton Interactive, Inc., No. 19-CV-11711 (LJL), 2022 WL 179771, at *11 (S.D.N.Y. Jan. 19, 2022) (noting witness could be cross-examined about impersonating a lawyer under Rule 608(b)); Tapp v. Tougas, No. 05-CV-1479 (NAM), 2018 WL 1918605, at *4 (N.D.N.Y. Apr. 20, 2018) (concluding witnesses could be cross-examined about impersonating others under Rule 608(b)). The defendant's effort to pass off the Civilian as an NCPD officer—akin to false impersonation of a law enforcement officer—is similarly probative of his credibility and is thus a proper subject for cross-examination.

IV.    <u>Evidence of Certain of the Defendant's Uncharged Crimes and Other Acts Is Relevant and Admissible</u>

The defendant moves to preclude the following "other acts" evidence as irrelevant under Rule 401 and unduly prejudicial under Rule 403: (1) evidence related to or referencing prostitution; (2) evidence that the defendant has engaged in or plans to engage in acts of violence; (3) evidence that suggests the defendant provided advice on how to obtain a false police report for a car accident.  Def's Mot. 4-10.  As noted above, the government does not intend to introduce evidence of prostitution in its case-in-chief.  The government also does not intend to introduce acts of violence committed by the defendant in its case-in-chief.  Accordingly, the Court should deny those motions as moot.

With respect to "evidence that suggests the defendant provided advice on how to obtain a false police report for a car accident," the government anticipates limited testimony from CW #2 and a brief recording demonstrating that the defendant advised CW #2 to tell his father to file a false police report about a car accident in order to obtain coverage for the repairs.

As set forth in the government's motions <u>in limine</u>, evidence that the defendant assisted CW #2 with matters beyond the illegal gambling parlors, including that the defendant advised CW #2 to tell his father to file a false police report, is admissible.  First, such evidence demonstrates the relationship of trust between CW #2 and the defendant.  That relationship of trust is crucial to the jury's understanding of the reasons why CW #2 felt comfortable asking the defendant (a detective) to assist the Bonanno crime family in shutting down gambling parlors.  <u>See, e.g.</u>, <u>United States v. Araujo</u>, 79 F.3d 7, 8 (2d Cir. 1996) (finding evidence of prior illicit relationship between the defendant and her co-conspirator admissible because it was "relevant to show that [the co-conspirator] trusted [the defendant] enough to request that she participate in the drug pick-up.  Steadfast behavior in carrying out another—albeit different—crime would tend to show the basis for that trust"); <u>United States v. Guerrero</u>, 882 F. Supp. 2d 463, 492-93 (S.D.N.Y. 2011), aff'd, 560 F. App'x 110 (2d Cir. 2014) (finding evidence related to the defendants' prior illicit transactions with their co-conspirators was "plainly admissible to explain the development of the illegal relationship between the defendants and their co-conspirators and explain [t]he mutual trust that existed between the coconspirators (including the cooperating Government Witnesses)").  That relationship is similarly important to show the defendant's motive to lie to FBI Special Agents in response to questions about CW #2 and CW #1.  <u>See, e.g.</u>, <u>Coonan</u>, 938 F.2d at 1561 ("Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed.").

Moreover, there is no basis to exclude this evidence under Rule 403.  As explained in the government's motions and above, evidence that the defendant assisted CW #2 with matters beyond competing gambling parlors is highly probative and the defendant will not suffer any "undue" prejudice because the evidence is no more inflammatory than the charged crimes.  Finally, even if there were a danger of undue prejudice, any such risk could be mitigated by a cautionary instruction limiting the jury's consideration of the evidence to the purposes for which it is offered.  <u>E.g.</u>, <u>United States v. Memoli</u>, 648 F. App'x 91, 94 (2d Cir. 2016) (collecting cases).

Accordingly, the Court should deny the defendant's motion to preclude "evidence that suggests the defendant provided advice on how to obtain a false police report for a car accident."

V.    <u>Testimony About How the Defendant and CW #2 Met Is Admissible</u>

        The defendant moves to preclude evidence that he met CW #2 through an individual named Chandler as irrelevant under Rule 401. At trial, the government anticipates eliciting only that CW #2 met the defendant because Chandler sent the defendant to CW #2's auto repair shop for work on his car. The government does not intend to elicit testimony from CW #2 about his knowledge of Chandler's illegal activities or the extent of Chandler's relationship with the defendant. Accordingly, the Court should deny the defendant's motion to preclude any testimony about how CW #2 and the defendant met.

VI.    <u>Conclusion</u>

        For the reasons above, the Court should deny the defendant's motions <u>in limine</u>.

        Respectfully submitted,

        JOHN J. DURHAM
        United States Attorney

By:            /s/
        Anna L. Karamigios
        Sophia M. Suarez
        Sean M. Sherman
        Assistant U.S. Attorneys
        (718) 254-7000

cc:    Defense Counsel (by ECF)
       Clerk of Court (by ECF)