ALK/SMS
F. #2018R00369

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                           Docket No. <u>22-CR-355 (ENV)</u>

HECTOR ROSARIO,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - X


## MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANT'S <u>POST-TRIAL MOTION FOR ACQUITTAL</u>


JOSEPH NOCELLA, JR.
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201


Anna L. Karamigios
Sean M. Sherman
Assistant U.S. Attorneys
   (Of Counsel)

TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ..................................................................................................................... 1

I.   Procedural Background................................................................................................. 1

II.  The Government's Case as to Count Eight.................................................................. 3

    A.  The Defendant's Involvement with Organized Crime and Illegal Gambling..................... 4

    B.  The Defendant Knew Damiano Zummo and Sal's Shoe Repair ...................................... 5

       1.  Evidence the Defendant Knew Damiano Zummo .......................................................... 5

       2.  Evidence the Defendant Knew Sal's Shoe Repair ......................................................... 7

    C.  The Defendant's False Statements................................................................................... 8

    D.  The Materiality of the Defendant's False Statements....................................................... 9

    E.  The Jury Instructions and Verdict................................................................................... 11

ARGUMENT .......................................................................................................................... 12

The Jury's Verdict Was Supported by Sufficient Evidence  that the Defendant's False Statements
    Were Material ................................................................................................................... 12

    A.  Rule 29 Legal Standard.................................................................................................... 12

    B.  Discussion ........................................................................................................................ 13

CONCLUSION........................................................................................................................ 20

TABLE OF AUTHORITIES

Page(s)

Cases

United States v. DeFilippo,
   No. 17-CR-585, 2018 WL 11211500 (S.D.N.Y. July 23, 2018) ............................................. 14
United States v. Eppolito,
   543 F.3d 25 (2d Cir. 2008) ...................................................................................................... 18
United States v. Foxworth,
   334 F. App'x 363 (2d Cir. 2009) ............................................................................................. 14
United States v. Guadagna,
   183 F.3d 122 (2d Cir. 1999) .................................................................................................... 13
United States v. Jabar,
   19 F.4th 66 (2d Cir. 2021) ....................................................................................................... 15
United States v. Klein,
   913 F.3d 73 (2d Cir. 2019) ...................................................................................................... 13
United States v.Mamadjonov,
   2024 WL 1478163 (D. Conn. Apr. 5, 2024)............................................................................ 15
United States v. Martoma,
   894 F.3d 64 (2d Cir. 2017) ...................................................................................................... 13
United States v. McBane,
   433 F.3d 344 (3d Cir. 2005) .................................................................................................... 14
United States v. Monica,
   295 F.2d 400 (2d Cir. 1961) .................................................................................................... 13
United States v. Pugh,
   945 F.3d 9 (2d Cir. 2019) ........................................................................................................ 13
United States v. Rosa,
   17 F.3d 1531 (2d Cir. 1994) .................................................................................................... 13
United States v. Santiago,
   No. 13-CR-39, 2014 WL 4827883 (S.D.N.Y. Sept. 26, 2014)................................................ 14
United States v. White,
   7 F.4th 90 (2d Cir. 2021) ...................................................................................... 12, 13, 16, 18
United States v. White,
   673 F.2d 299 (10th Cir. 1982) ................................................................................................. 13

Statutes

18 U.S.C. § 1001 ............................................................................................................................. 1

Rules

Federal Rule of Criminal Procedure 29 ................................................................................. passim

The government respectfully submits this memorandum of law in opposition to the defendant's post-trial motion for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure ("Rule 29").

## PRELIMINARY STATEMENT

On March 5, 2025, following a one-week trial, a jury convicted the defendant, Hector Rosario, of making false statements to agents of the Federal Bureau of Investigation, in violation of Title 18, United States Code, Section 1001(a)(2) (Count Eight). The defendant now moves under Rule 29 to overturn the jury's guilty verdict on Count Eight, arguing only that the evidence at trial did not establish that the defendant's false statements were material. See ECF No. 177 ("Def. Br.") at 7-14.

The defendant's motion is meritless and falls far short of meeting his heavy burden under Rule 29. As detailed below, the government presented overwhelming evidence at trial— including audio recordings of the defendant and the testimony of several cooperating witnesses— that proved every element of the defendant's guilt beyond a reasonable doubt. In reaching its verdict, the jury implicitly rejected the inferences that the defendant now asks the Court to make to usurp the jury's decision. Accordingly, the defendant's motion to overturn the jury's unanimous verdict should be denied.

## BACKGROUND

I.    Procedural Background

On August 4, 2022, as a result of a long-running FBI investigation into organized crime and illegal gambling in Long Island, a grand jury sitting in this District returned an indictment, charging the defendant as well as members and associates of the Bonanno Crime Family of La Cosa Nostra ("the Bonanno Crime Family") with various crimes. See ECF No. 1 (the "Indictment"). Specifically, the Indictment charged Agostino Gabriele, Anthony Pipitone,

also known as "Little Anthony," and Vito Pipitone—each of whom is a member or associate of the Bonanno Crime Family—with racketeering, in violation of Title 18, United States Code, Section 1962(c); money laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h); and the operation of several illegal gambling businesses, in violation of Title 18, United States Code, Section 1955(a).

As particularly relevant here, Count Eight of the Indictment charged the defendant with making false statements about an organized crime member and an illegal gambling parlor, in violation of Title 18, United States Code, Section 1001(a)(2). Count Eight specifically alleged that the defendant falsely stated to FBI Special Agents that: (1) he did not know the identity of Damiano Zummo,[1] a made member of the Bonanno Crime Family involved in illegal gambling; and (2) he was not familiar with the illegal gambling parlor known as "Sal's Shoe Repair" located in and around 41 Merrick Avenue in Merrick, New York. See ECF No. 1 at 12. Count Seven of the Indictment charged the defendant with obstruction of justice, in violation of Title 18, United States Code, Section 1512(c)(2), for obstructing the government's investigation into organized crime and illegal gambling.

Also on August 4, 2022, the same grand jury returned an indictment charging Joseph Macario, also known as "Joe Fish," Carmelo Polito, also known as "Carmine Polito," Salvatore Rubino, also known as "Sal the Shoemaker," and Joseph Rutigliano, also known as "Joe Box"—each of whom is a member or associate of the Genovese Crime Family of La Cosa Nostra (the "Genovese Crime Family")—with racketeering, in violation of Title 18, United States Code,

---

[1]    In the Indictment, Zummo was identified as John Doe. See ECF No. 1. At trial, the jury was told that John Doe was Damiano Zummo, and the verdict sheet reflected that the jury understood Zummo to be John Doe. See ECF No. 174 at 4.

2

Section 1962(c); money laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h); and the operation of several illegal gambling businesses—including Sal's Shoe Repair—in violation of Title 18, United States Code, Section 1955(a).[2] As discussed further below, these charges overlap with the charges in the Indictment. Specifically, both indictments charge members and associates of the Genovese and the Bonanno Crime Family with jointly operating an illegal gambling business at the "Gran Caffe" in Lynbrook, New York.

Trial began on February 25, 2025. On March 5, 2025, the jury unanimously found the defendant guilty on Count Eight of the Indictment and not guilty on Count Seven of the Indictment. See generally ECF No. 174.

II.    The Government's Case as to Count Eight

Because the defendant challenges the sufficiency of the evidence as to materiality of the defendant's false statements underlying Count Eight, the government sets forth the central evidence supporting that charge below.[3] The government's evidence at trial principally consisted of testimony of cooperating and law enforcement witnesses, audio recordings of the defendant, photographs, and documentary evidence.

---

[2] The indictment also charged Mark Feuer and Polito with operating an illegal online sports betting business together, in violation of Title 18, United States Code, Section 1955(a). Polito was also charged with attempting to extort an individual who incurred a debt betting on Polito and Feuer's website, in violation of Title 18, United States Code, Section 1951(a).

[3] During its case-in-chief, the government introduced testimony from witnesses and exhibits detailing the involvement of organized crime families in various illegal gambling establishments as well as the defendant's illegal conduct on behalf of the Bonanno Crime Family, Salvatore Russo, and Damiano Zummo. The evidence cited herein is only a summary of certain evidence relevant to the defendant's argument as to materiality and does not include all of the trial evidence that supported the charged counts.

A.    The Defendant's Involvement with Organized Crime and Illegal Gambling

The evidence presented at trial showed that members and associates of the Genovese, Bonanno, and Gambino Crime Families controlled competing illegal gambling parlors on Long Island. See Trial Transcript ("Tr.") 63–70, 102–106, 162–163, 183–184, 211–213, 216–219. Among the competing illegal gambling spots was Sal's Shoe Repair—operated by Genovese associate Salvatore Rubino for the benefit of the Genovese Crime Family—and the Gran Caffe, which was, for a time, jointly controlled by the Genovese and Bonanno Crime Families. See Tr. 78–81, 208, 219.

After a dispute between the Bonanno and Genovese Crime families over control of the illegal gambling at the Gran Caffe, the Bonanno Crime Family paid the defendant to try to intimidate and close down rival gambling parlors controlled by the Genovese, including Sal's Shoe Repair. See Tr. 82–83, 87–88, 98–100, 163–165, 220-22. The defendant was also paid to attempt to close down rival gambling spots controlled by the Gambino Crime Family. See, e.g., Tr. 108–109.

The defendant was recruited to work for the Bonannos by Bonanno Crime Family associate Salvatore Russo, who the defendant knew well. See Tr. 173–183, 220–22. As detailed below, from his relationship with Russo, the defendant also knew Russo's "cousin," Bonanno Crime Family member Damiano "Danny" Zummo. See infra pp. 5–6. In exchange for money from the Bonannos, the defendant attempted to intimidate the Gambinos and Genovese at several of their illegal gambling parlors, see Tr. 222–234, 244–46, including by conducting a fake police raid on Sal's Shoe Repair, Tr. 234–244.

In approximately November 2017, Zummo and Russo began cooperating with the government. See Tr. 116–18, 253. From their cooperation, the government learned about the Bonanno and Genovese Crime Families' involvement in illegal gambling at the Gran Caffe, Sal's

4

Shoe Repair, and other locations, and also about the defendant's efforts to shut down rival illegal gambling spots on behalf of the Bonanno Crime Family. See Tr. 119, 158–59, 459–461. The FBI subsequently began investigating illegal gambling and organized crime at the Gran Caffe, Sal's Shoe Repair, and elsewhere, in an investigation called "Double Jackpot." See Tr. 459–61.

On January 27, 2020, FBI agents interviewed the defendant in order to, among other things, gather evidence regarding members of organized crime and illegal gambling locations. See Tr. 463:1–4, 675–77, 686. The defendant does not dispute that during the interview he repeatedly lied to the FBI agents. Although the defendant had attempted to shut down several illegal gambling parlors for the Bonanno Crime Family, the defendant told the FBI agents that he was not aware of any illegal gambling, including illegal gambling at Sal's Shoe Repair—the very spot that he had raided. See Tr. 466–479. The defendant also denied knowing certain members and associates involved in organized crime and illegal gambling, including Zummo. See id.

B.      The Defendant Knew Damiano Zummo and Sal's Shoe Repair

The defendant does not dispute that he knew Damiano Zummo or the illegal gambling parlor Sal's Shoe Repair. Nor could he. The evidence at trial on these points was overwhelming.

1.      Evidence the Defendant Knew Damiano Zummo

At trial, cooperating witnesses Damiano Zummo and Salvatore Russo both testified that the defendant knew Zummo. And their testimony was corroborated by the defendant's own recorded statements.

Zummo testified that he knew the defendant, identified him in Court, and explained to the jury that he and the defendant had met at least five times. Tr. 49:19–23, 114–16. Zummo testified that on one occasion, the defendant and Russo came to Zummo's home, at which time the defendant warned Zummo about a law enforcement investigation. Tr. 111. Specifically, Zummo

5

stated that he met the defendant and Russo in his driveway, and the defendant told him that Gambino associate Damiano Coraci—who Zummo had recently been interacting with—was under investigation, that the defendant had seen Zummo's photograph at a police precinct, and warned Zummo to stay off of the phones because "the feds are listening." Tr. 112:12.

Zummo's testimony about the defendant's meeting with him at his home was corroborated by the defendant himself. At trial, the government introduced a consensual recording of a conversation between the defendant and Russo. See Government Exhibit ("GX") 103. During the recording, Russo asked the defendant: "Remember my cousin Danny?" The guy, the, with, the cement?" The defendant responded: "the one that we went to his house that one time." See id. As noted below, Russo also corroborated the driveway meeting.

In addition to the instance when the defendant met with Zummo at Zummo's home, Zummo also testified that he and the defendant met on the following occasions:

- Zummo saw the defendant once or twice at Russo's autobody shop, Tr. 114:14–19, 138:20–25;

- Zummo saw the defendant at an illegal gambling parlor that Zummo and Russo had opened together in Brooklyn, Tr. 114:20–115:7;

- Zummo saw the defendant once or twice at Russo's bar, the Blue Tequila, Tr. 115:8–17;

- Zummo saw the defendant at a hotel in Garden City, where Zummo was staying with his family because his air conditioner was broken, Tr. 115:18–116:18

Russo testified that he had known the defendant since 2006. Tr. 173:19–20. Russo testified that the defendant knew Zummo, and that they had first been introduced at Russo's son's birthday party. See Tr. 220. Russo also testified—consistent with Zummo's testimony and the consensual recording (GX103)—that on one occasion, he and the defendant went to Zummo's house together in Roslyn, New York and spoke in Zummo's driveway. See Tr. 267:14–268:2.

6

2.      Evidence the Defendant Knew Sal's Shoe Repair

At trial, Russo and Zummo both testified about paying the defendant to conduct a fake police raid on the Genovese Crime Family's illegal gambling spot, Sal's Shoe Repair. Their testimony was not only corroborated by the defendant's own recorded statements, but also by the proprietor of Sal's Shoe Repair, Genovese associate Salvatore Rubino.

Russo testified at length about how he and Zummo planned for the defendant to conduct a fake police raid on Sal's Shoe Repair in order to intimidate the Genovese Crime Family. See Tr. 236–242. Russo testified that he drove the defendant past Sal's Shoe Repair and explained the layout of the store and illegal gambling to the defendant. See Tr. 237:9–14. He further testified that he was present on the evening that the defendant and his associates conducted a fake police raid of Sal's Shoe Repair, culminating in one of the defendant's associates cracking the screen of one of the illegal gambling machines. See Tr. 238–242. He also testified that the defendant was paid $2,500 for the job, and that the payment was illegal gambling proceeds from the Gran Caffe. See Tr. 243:20–25.

Zummo testified consistently with Russo. He testified that Russo came up with a plan that Zummo agreed with for the defendant to conduct a fake raid at Sal's Shoe Repair, and that Zummo had put the defendant "on record" with his captain, Anthony Pipitone. Tr. 99–101. He testified that Russo told him that during the raid, the defendant and two other individuals went into Sal's Shoe Repair and broke one of the gambling machines. Tr. 102:1–8.

Zummo and Russo's testimony was corroborated by the defendant himself. During a consensual recording between Russo and the defendant, Russo stated, "Remember the guy, when I sent you to, the shoemaker, that time to get in, and fucking, ha, all that shit?" GX103. The defendant responded affirmatively, "Mmmhmm." Id.

7

The testimony and audio recording were also corroborated by cooperating witness Salvatore Rubino, an associate of the Genovese Crime Family who was present at his shoe store/illegal gambling club on the night of the fake police raid. Rubino identified the defendant in court and testified that the defendant and other individuals had conducted a raid on Sal's Shoe Repair under the guise of a legitimate law enforcement operation. See Tr. 510:2–3, 555–565. Rubino testified that during the fake police raid, one of the defendant's associates used a large flashlight to break the screen of one of the illegal gambling machines, and then the defendant issued a warning to Rubino: "Stay away from Joe Box," referring to another Genovese family associate. Tr. 563:3–19.

C.      The Defendant's False Statements

The defendant also does not dispute that when FBI Special Agents asked him about Damiano Zummo and Sal's Shoe Repair, he lied. The defendant's lies to the FBI were clearly established at trial.

FBI Special Agent Orlando Tactuk testified that on January 27, 2020, he and another FBI agent went to the defendant's residence to interview him. Tr. 463–464. During the interview, the agents asked the defendant about several illegal gambling establishments, as well as numerous organized crime members and associates involved in illegal gambling and other criminal activity. As relevant here, Special Agent Tactuk testified that he showed a photograph of Damiano Zummo to the defendant (GX19) and asked the defendant if he could identify the person in the photograph. Tr. 490:4–12. Zummo, as noted previously, was an individual that the defendant knew and also knew to be involved in illegal gambling and organized crime. See supra pp. 5–6. Nevertheless, the defendant told the agents that he could not identify Zummo. Tr. 490:13–15. The agents also asked the defendant if he was aware of the name "Damiano Zummo." Tr. 490:20–21. The defendant told the agents that he was not aware of the name. Tr. 490.

8

Special Agent Tactuk further testified that during the defendant's interview, the FBI agents asked the defendant if he was aware of the business "Sal's Shoe Repair." Tr. 470:15–18. As described above, the defendant had been paid by the Bonanno Crime Family to conduct a fake police raid on the illegal gambling club located in Sal's Shoe Repair. See supra pp. 7–8. However, the defendant told the FBI that he was not aware of the business. Tr. 470:19. The agents also asked the defendant if he was aware of the address for Sal's Shoe Repair, 41 Merrick Avenue, in Merrick, New York–and the defendant against said he was not aware of that address. Tr. 470:20–471:1. Special Agent Tactuk also testified that they had asked the defendant if he was aware of illegal gambling at Sal's Shoe Repair, and the defendant had told the agents that he was not. Tr. 471:4–7. He further testified that they had asked whether the defendant had ever interacted with Sal's Shoe Repair or investigated the location as part of his job as a detective with the Nassau County Police Department. Tr. 471: 8–15. The defendant told the agents that he had not done so. See id.

D.    The Materiality of the Defendant's False Statements

Two law enforcement witnesses testified that the defendant's lies were capable of influencing the FBI's investigation into illegal gambling and organized crime on Long Island.

First, FBI Special Agent Tactuk testified about the origins of the Double Jackpot investigation and how the defendant's lies could have influenced that investigation. Special Agent Tactuk testified that he was the source handler for Russo, who began cooperating with the FBI in 2017. Tr. 457:6–18. He explained that Russo provided historical and proactive cooperation related to illegal gambling and organized crime on Long Island. Tr. 458:21–459:10, 461:11–13. He testified that, among other things, Russo told the FBI about the defendant's efforts to intimidate and shut down rival illegal gambling clubs on behalf of the Bonanno Crime Family. See Tr. 460:17-21.

9

Special Agent Tactuk testified that Russo's information concerning organized crime and gambling, including the defendant's role in it, was shared with another FBI squad, which pursued that information through the Double Jackpot investigation. Tr. 459–60. Special Agent Tactuk further testified that before interviewing the defendant on January 27, 2020, he had conferred with Special Agents involved in the Double Jackpot investigation. He testified that those agents were interested in the interview of the defendant because they were seeking to identify members of organized crime that were operating in Nassau County as well as illegal gambling operations in that area. Tr. 463:8–23.

Special Agent Tactuk testified that if the defendant had told the FBI that he was aware of illegal gambling locations—i.e., Sal's Shoe Repair—then "that information would have been used to bolster existing investigations or potentially open new investigations." Tr. 479:7–8. He similarly testified that if the defendant had told the FBI that he was aware of any of the individuals he was asked about—i.e., Damiano Zummo—then that information also "would have been shared to either bolster existing investigations or open new investigations." Tr. 479:9–18. He also testified that the information would have been helpful to the FBI's investigation into organized crime and illegal gambling. Tr. 479:19–21.

FBI Special Agent Jarryd Butler—a case agent on the Double Jackpot investigation—also testified about how the defendant's lies were capable of affecting the Double Jackpot investigation. Special Agent Butler testified that the Double Jackpot investigation was initiated based on historical information provided by Russo and Zummo about organized crime involvement in illegal gambling at the Gran Caffe, Sal's Shoe Repair and other locations on Long Island. Tr. 675:18–21, 676:17–677:14. Special Agent Butler testified that the agents involved in the Double Jackpot investigation were interested in Special Agent Tactuk's interview of the

10

defendant because they believed that the defendant had evidence that would assist them in their investigation.  See Tr. 686:6–19.

Special Agent Butler also testified about the value of evidence to the agents conducting the Double Jackpot investigation.  Specifically, Special Agent Butler testified that if multiple witnesses have information about the same subject, the FBI would interview them both in order to "gather as much evidence as possible."  Tr. 668:20–24.  He explained that when the FBI conducts organized crime investigations like Double Jackpot, the FBI uses multiple investigative techniques and prefers to have multiple sources of information because the information "can corroborate itself."  Tr. 674:15–675:1.

E.      The Jury Instructions and Verdict

At the close of the government's case, the defendant moved for a judgment of acquittal under Rule 29.  Tr. 718:12–19.  The Court reserved decision on the defense motion. Tr. 720:11–12.  The defendant rested without presenting a defense case.  Tr. 720:13–14.  The Court then instructed the jury on the elements of the crimes charged.  As part of the jury instructions, the Court explained to the jury that "the Government must prove beyond a reasonable doubt that . . . the defendant's statement or representation was material" and that "[a] fact is material if it was capable of influencing the Government's decisions or activities."  Tr. 884:18–22.  The Court further explained that "proof of actual reliance on the statement by the Government is not required." Tr. 884:22–24.

During the defendant's summation as to Count Eight, defense counsel argued almost exclusively that the jury should acquit the defendant based on an absence of materiality, claiming that the FBI already knew the information the defendant was asked and arguing that the FBI's interview of the defendant was effectively a perjury trap.  See Tr. 805:3–5 ("The question at this trial is whether the statements Mr. Rosario made to the FBI in January 2020 were material"),

11

805:22 ("What we know from the Government's evidence is that there wasn't a single question they didn't already know the answer to."), 806:6–9 ("This wasn't an interview where the FBI went out hoping to get answers and further their investigation.  This was an interview where they hoped Mr. Rosario would lie."), 806:13 ("Because the FBI believed that they knew the facts during that interview, his statements did not have the capacity to influence them.").

After approximately two days of deliberations, the jury rejected that argument and returned a verdict of guilty as to Count Eight.  See Tr.  932:13–15.

ARGUMENT

THE JURY'S VERDICT WAS SUPPORTED BY SUFFICIENT EVIDENCE
THAT THE DEFENDANT'S FALSE STATEMENTS WERE MATERIAL

The defendant moves under Rule 29 for the Court to overturn the jury's unanimous verdict and enter a judgment of acquittal on Count Eight, contending that the government's evidence was insufficient to prove that the defendant's lies were material.  As set forth below, the defendant wholly ignores significant evidence and reasonable inferences that the jury was permitted to draw from that evidence.  Contrary to the defendants' contention, the trial evidence supporting Count Eight was strong, and the defendant's motion should be denied.

A.    Rule 29 Legal Standard

"If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal pursuant to Federal Rule of Criminal Procedure 29(c), but it may do so only when there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt." United States v. White, 7 F.4th 90, 98 (2d Cir. 2021) (internal quotation marks omitted). "A conviction must be upheld if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," and the evidence must be viewed "in the light most favorable to the government, crediting every inference that could have been drawn in the

12

government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." Id. (internal quotation marks omitted) (emphasis in original). "In other words, the court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is 'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999) (quoting United States v. White, 673 F.2d 299, 301 (10th Cir. 1982)).

Thus, a defendant challenging a jury's guilty verdict "bears a heavy burden." United States v. Martoma, 894 F.3d 64, 72 (2d Cir. 2017), cert. denied, 139 S. Ct. 2665 (2019) (internal quotation marks omitted). In assessing a Rule 29 motion under this standard, a reviewing court must consider the evidence as a whole, not in isolation. United States v. Klein, 913 F.3d 73, 78 (2d Cir. 2019). This is so because "each fact may gain color from others." Guadagna, 183 F.3d at 130 (citing United States v. Monica, 295 F.2d 400, 401 (2d Cir. 1961)).

In addition to resolving any issue regarding witness credibility in the government's favor, the Court must leave to the jury the task of choosing among permissible competing inferences that can be drawn from the evidence. See, e.g., United States v. Pugh, 945 F.3d 9, 19 (2d Cir. 2019). In deciding which inferences to draw, the jury is entitled to use its common sense, Klein, 913 F.3d at 79, and "[t]he fact that a trier of fact has declined to draw one of two or more competing inferences does not mean that the inferences not drawn were not available or were not reasonable," United States v. Rosa, 17 F.3d 1531, 1542 (2d Cir. 1994).

B.    Discussion

Because the trial record includes testimony by multiple law enforcement witnesses about how the defendant's false statements could have influenced the FBI's investigation, the Court should deny the defendant's motion for a judgment of acquittal.

13

### 1. The Defendant Misapplied the Legal Standards for Materiality and Rule 29

As an initial matter, the defendant's motion applies the incorrect legal standards for materiality and for Rule 29. See Def. Br. at 7–14. Despite citing to cases that correctly set forth the legal standard for materiality, the defendant argues that his statements were not material because the FBI "knew the information" they were trying to gather from the defendant, Def. Br. at 10, and thus the statements "did not have the capacity to influence the FBI or distract its investigators away from a critical matter," Def. Br. at 7; see also Def. Br. at 9–10.

As the defendant himself correctly acknowledges in his brief, "[i]t is not in dispute that a false statement need not actually influence a government function; indeed, it is whether such a false statement had the capacity to influence or distract government investigators' attention away from a critical matter." Def. Br. at 7 (citations omitted). Because "the test of materiality is objective, not subjective . . . a statement is material if it is capable of influencing a decision by a decision-making body even if the body did not in fact rely on the statement." United States v. Santiago, No. 13-CR-39, 2014 WL 4827883, at *5 (S.D.N.Y. Sept. 26, 2014) (emphasis in original); see also United States v. Foxworth, 334 F. App'x 363, 366 (2d Cir. 2009) (explaining that whether "the FBI knew that the statements were false when they were made is irrelevant to their materiality."); United States v. McBane, 433 F.3d 344, 350–52 (3d Cir. 2005) (holding that false statements were material even though they did not actually influence the government's decisions because they were "capable of influencing a reasonable decisionmaker"); United States v. DeFilippo, No. 17-CR-585, 2018 WL 11211500, at *2 (S.D.N.Y. July 23, 2018) ("Irrespective of whether the investigators were in fact influenced, a rational fact-finder certainly could have concluded that [the defendant's] statements were capable of doing so by deflecting scrutiny or diverting the attention of the investigators away from him.") (emphasis in original).

14

In <u>United States v. Jabar</u>, for example, the defendants were charged with falsely telling a law enforcement agent that United Nations grant money was used appropriately when the defendants actually used the money pay off their personal loans. 19 F.4th 66, 75 (2d Cir. 2021). On appeal, the defendants argued that the government failed to prove the false statements were material because at the time the defendants lied, the government already knew the defendants misappropriated the grant money and therefore the false statements "would not have changed [the government's] investigation." <u>Id.</u> at 84. Indeed, the agent testified that the defendant's responses "would not have changed his investigation." <u>Id.</u> The Second Circuit disagreed, stating that the jury "could reasonably conclude [the defendants'] explanations for whether they properly used the grant was 'capable of influencing' the investigation, which is all that was required." <u>Id.</u>

Similarly, in <u>United States v. Mamadjonov</u>, the defendant was charged with lying to the FBI about whether his brother was deceased—he claimed he was alive—in connection with an investigation into whether he and his brother had provided material support to a terrorist organization. No. 3:18-CR-34 (VAB), 2024 WL 1478163, at *5 (D. Conn. Apr. 5, 2024). The defendant moved for acquittal under Rule 29, arguing that the FBI knew his brother was dead, so his lie that his brother was alive could not have been material. <u>See id.</u> In rejecting that argument, the Court explained that the defendant's answers to the FBI "could be 'material' even if the FBI already knew the answers to the questions asked of him, and his responses to their questions would not have changed their investigation." <u>Id.</u>

Thus, notwithstanding the defendant's arguments to the contrary here, the fact that the agents already had information indicating that the defendant knew Zummo and Sal's Shoe Repair is irrelevant to the analysis of the materiality of the defendant's lies, because the government was not obligated to show that the defendant's false statements actually influenced or

15

hindered the FBI's investigation. Under the legal standard for materiality, the government was only required to show that the defendant's false statements were <u>capable</u> of influencing investigators. As detailed above and discussed further below, the evidence at trial showed that the defendant's lies were capable of influencing the FBI.

The defendant also misapplies Rule 29 when he argues that Special Agent Tactuk's testimony about the purpose of his interview with the defendant "feigns legitimacy." Def. Br. at 8–9. The defendant asks the Court to adopt <u>the defendant's</u> inference from the testimony at trial, which is that the FBI agents did not interview the defendant to further their investigation, but rather, that the "true intention" of the interview was to "elicit either admissions of guilt or false statements." Def. Br. at 7–9; <u>see</u> Def. Br. at 10 ("The facts show that the FBI did not at all intend to gather information to further its investigation."). Not only are the agents' "true intentions" irrelevant, as noted previously—because the standard for materiality is objective—but on a Rule 29 motion, the evidence must be viewed "in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." <u>White</u>, 7 F.4th at 98. Here, as detailed below, Special Agents Butler and Tactuk testified that they interviewed the defendant to obtain information and that the defendant's false statements were capable of influencing the FBI's investigation.

16

### 2. The Trial Evidence Proved the Defendant's Lies Were Material

The evidence at trial established beyond a reasonable doubt that the defendant's false statements were capable of influencing the FBI's Double Jackpot investigation.

As Special Agents Tactuk and Butler testified, at the time that FBI agents interviewed the defendant, the FBI was engaged in the Double Jackpot investigation into organized crime and illegal gambling involving the Bonanno and Genovese Crime Families on Long Island. See Tr. 459–463, 686. The FBI agents asked the defendant questions about Damiano Zummo—a member of the Bonanno Crime Family involved in the illegal gambling at the heart of the Double Jackpot investigation—and Sal's Shoe Repair—an illegal gambling parlor run by the Genovese Crime Family that was also part of the investigation. Tr. 470–71, 490.

The defendant's lies in response to these questions, which were about individuals and locations at the core of the Double Jackpot investigation, were capable of influencing the investigation, and the FBI agents testified as much. See Tr. 479:7–18 (Special Agent Tactuk testifying that if the defendant had stated he was aware of Sal's Shoe Repair then "that information would have been used to bolster existing investigations or potentially open new investigations."), 479:9–18 (Tactuk testifying that if the defendant had stated he knew Zummo then that "would have been shared to either bolster existing investigations or open new investigations."), 686:6–19 (testimony by Special Agent Butler that the information would have been helpful to the Double Jackpot investigation).

Special Agent Butler also testified about the value of evidence, including information from multiple witnesses. See Tr. 668:20–24, 674:15–675:1. In other words, Special Agent Butler testified that even though the FBI had information from Russo, Zummo, and otherwise, the FBI was still interested in information from the defendant, even if that information overlapped with information it had received from those other sources. Moreover, while

17

materiality, as noted previously, is objective, there is also no evidence that the defendant <u>knew</u> that either Russo or Zummo were cooperating with the FBI. Thus, when the defendant lied to the FBI about Zummo and Sal's Shoe Repair, he certainly was trying to influence their investigation; he just did not succeed.

After the presentation of the evidence, the Court correctly instructed the jury on the elements of the crime, including materiality. In returning a guilty verdict, and therefore finding that the government had proven every element of the crime, including materiality, beyond a reasonable doubt, the jury necessarily found to be credible the government's witnesses who testified about the materiality of the defendant's false statements. Accordingly, the conviction must be upheld because, "deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence," it is clear that a rational trier of fact could have found, and in fact did find, that the government proved the essential elements of the crime beyond a reasonable doubt. <u>White</u>, 7 F.4th at 98.

At bottom, the defendant asks this Court to substitute the defendant's own view of the evidence for that of the jury's verdict. The defendant's sole post-trial claim—that this was in effect an FBI setup to catch the defendant in a lie—is simply an argument or competing inference about the evidence that the jury was free to consider and reject. <u>See, e.g.</u>, <u>United States v. Eppolito</u>, 543 F.3d 25, 45 (2d Cir. 2008) (holding that court "must defer to the jury's choice" about which inferences to draw because "it is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence" (citations and internal quotation marks omitted)). Indeed, in their summation, the defense made this precise argument the centerpiece of their argument on Count Eight to the jury. <u>See</u> Tr. 805:3–5 ("The question at this trial is whether the statements Mr. Rosario made to the FBI in January 2020 were material"), 805:22 ("What we know

18

from the Government's evidence is that there wasn't a single question they didn't already know the answer to."), 806:6–9 ("This wasn't an interview where the FBI went out hoping to get answers and further their investigation.  This was an interview where they hoped Mr. Rosario would lie."), 806:13 ("Because the FBI believed that they knew the facts during that interview, his statements did not have the capacity to influence them.").  And regardless, as explained previously, the inference that the defense pushed on the jury—that the government knew the underlying information and was merely looking to charge the defendant—is legally irrelevant as to whether the defendant was guilty of making materially false statements to the FBI.

That the jury chose not to believe the defendant's arguments or version of the events does not warrant reversing the jury's verdict or granting a new trial, especially where, as here, the jury was appropriately admonished to instead consider the objective standard that governs whether the defendant's lies were material.  The defendant's motion for a judgment of acquittal on this basis should therefore be denied.

19

CONCLUSION

For the reasons set forth above, the government respectfully submits that the Court

should deny the defendants' post-trial motion for a judgment of acquittal.

Dated:    Brooklyn, New York
          May 12, 2025

                                        Respectfully submitted,


                                        JOSEPH NOCELLA, JR.
                                        UNITED STATES ATTORNEY
                                        Eastern District of New York
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201


                            By:  _____/s/_____
                                        Anna L. Karamigios
                                        Sean M. Sherman
                                        Assistant United States Attorneys
                                        (718) 254-7000

20